

MAY 10 2024 PM3:28
FILED - USDC - NDTX - LU

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Crim No. 2:10-cr-00039-J-BB-1 |
| SERGIO OMAR FLORES, | § | |
| | § | |
| Defendant. | § | |

## MOTION FOR COMPASSIONATE RELEASE PURSUANT TO
## 18 U.S.C. § 3582(C)(1)(A) AND THE FIRST STEP ACT OF 2018

COMES Defendant, SERGIO OMAR FLORES ("Flores"), appearing *pro se,*

and in support of this memorandum would show as follows:

## I. STATEMENT OF JURISDICTION

The district court's jurisdiction to correct or modify a defendant's sentence is

limited to those specific circumstances enumerated by Congress in 18 U.S.C. § 3582.

The scope of a proceeding under 18 U.S.C. § 3582(c)(2) in cases like this one is

extremely limited. *Dillon v. United States*, 130 S.Ct. 2683, 2687(2010). It is

black-letter law that a federal court generally "may not modify a term of

imprisonment once it has been imposed." *Id.* However, Congress has allowed an

exception to that rule "in the case of a defendant who has been sentenced to a term

of imprisonment based on a sentencing range that has subsequently been lowered by

the Sentencing Commission." 18 U.S.C. § 3582(c)(2); see also, *Freeman v. United States*, 131 S.Ct. 2685 (2011) (reciting standard for sentence modifications). Such defendants are entitled to move for retroactive modification of their sentences. *Dillon*, 130 S.Ct. at 2690–91.

## II. STATEMENT OF THE CASE

### A.     Procedural Background

On June 29, 2010, a grand jury sitting in the United States District Court for the Northern District of Texas, Amarillo Division, returned a one (1) count Indictment charging Flores with Possession with Intent to Distribute 500 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). See Doc. 13.[1]

On September 2, 2010, a Re-arraignment Hearing was held and Flores plead guilty to Count 1 of the Indictment, pursuant to a written Plea Agreement. See Doc. 33.

On November 19, 2010, Flores was sentenced to a term of 235 months' imprisonment, 5 years of Supervised Release, no Fine or Restitution, and a Mandatory Special Assessment Fee of $100. See Doc. 42.

---

[1]

"Doc." refers to the Docket Report in the United States District Court for the Northern District of Texas, Amarillo Division in Criminal No. 2:10-cr-00039-J-BB-1, which is immediately followed by the Docket Entry Number.

2

On October 19, 2011, Flores filed a Motion under 28 U.S.C. § 2255 to Vacate,

Set Aside or Correct Sentence by a Person in Federal Custody ("§ 2255 Motion"). See

Doc. 45.

On November 18, 2014, Flores filed a Motion to Reduce Sentence re: 2014

Drug Guidelines, which was denied on April 19, 2016. See Docs. 49, 54.

On December 18, 2012, the Court adopted the Report and Recommenation

denying Flores's § 2255 Motion. See CvDocs. 18-19.[2]

## B.   Statement of the Facts

### 1.   Offense Conduct

The United States and Flores, through the advise of his counsel, agreed and

stipulated to the following Factual Resume:

On Sunday, June 13, 2010, Texas Department of Public Safety Trooper Jason Kruger ("Trooper Kruger") stopped a sedan type vehicle Eastbound on Interstate 40 in Wheeler County, near Shamrock, Texas. The driver and sole occupant of the vehicle was identified as the defendant, Flores. Trooper Kruger stopped Flores for speeding. Flores had no driver's license in his possession. Records checks indicated that Flores had a Texas driver's license which was suspended. Flores told Trooper Kruger that he was travelling from his home in Mesa, Arizona to Oklahoma City, Oklahoma to visit his mother. Trooper Kruger noticed unusual nervousness in Flores. During the course of the stop, Trooper Kruger asked for and was granted consent to search the vehicle.

---

2

"CvDoc." refers to the Docket Report in the United States District Court for the Northern District of Texas, Amarillo Division in Civil No. 2:11-cv-00247-J-BB, which is immediately followed by the Docket Entry Number.

The trooper found packages he suspected of containing narcotics hidden in the back seat and other suspected narcotics in the trunk. Flores was arrested. After having arrested and advised of his rights, Flores told law enforcement officers that he knew the vehicle contained controlled substances and that he had been hired to transport drugs from Arizona to Kansas City, Kansas in exchange for payment of $1,000. The suspected narcotics were submitted to the lab in 2 exhibits and lab reports confirmed that there were 2,331 gross grams and a net weight of 2,254 grams containing 100% pure d-methamphetamine hydrochloride in the first submitted and 4,012 gross grams and a net weight of 3,920 grams containing 95.4% pure d-methamphetamine in the second exhibit.

See Doc. 35.

### 2.   Plea Proceeding

On September 2, 2010, a Re-arraignment Hearing was held before Judge Mary Lou Robinson. No Doc. Entry. Flores pled guilty to Count 1 of the Indictment, pursuant to a written Plea Agreement. See Doc. 33. In exchange of his guilty plea, Flores received 3-level reduction for his acceptance of responsibility, pursuant to USSG §§ 3E1.1(a) and (b).

### 3.   Sentencing Proceeding

On November 19, 2010, a Sentencing Hearing was held before Judge Mary Lou Robinson. No Doc. Entry. The Court sentenced Flores to a term of 235 months' imprisonment, that cost of incarceration fee was waived and that Flores received credit for time served as of June 13, 2010. See Doc.42. This is followed by 5 years' Supervised Release, no Fine or Restitution. *Id.* The Court also ordered a payment of

4

a Mandatory Special Assessment Fee of $100. *Id.*

### 4.    Postconviction Proceeding

On October 19, 2011, Flores filed a § 2255 Motion. See Doc. 45. In his Motion, Flores contends he received ineffective assistance of counsel based upon the following: (1) Counsel's failure to file a motion to suppress challenging the existence of probable cause and the validity of defendant's consent; (2) Counsel's failure to fully investigate the extent and severity of defendant's mental issues and present such to the Court in an attempt to receive a downward departure pursuant to 18 U.S.C. § 3553(a); and (3) Counsel's failure to properly inform and discuss with defendant his right to appeal. See CvDoc. 14.

Because the Court finds Flores' claims not credible, defendant Flores has failed to carry his burden of showing by a preponderance of the evidence he received ineffective assistance of counsel on appeal. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Montoya*, 226 F.3d at 408. Flores has not demonstrated his attorney's performance was deficient. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2064. Subsequently, the Court adopted the Report and Recommendation in denying Flores' § 2255 Motion. See CvDoc. 19.

## III. DISCUSSION

As a preliminary matter, respectfully requests that this Court be mindful that *pro se* complaints are to be held "to less stringent standards than formal pleadings drafted by lawyers," and should therefore be liberally construed. See *Hernandez v. Thaler*, 630 F.3d 420 (5th Cir. 2011); *Estelle v. Gamble*, 429 U.S. 97 (1976) (same); and *Haines v. Kerner*, 404 U.S. 519 (1972) (same).

### A.    Federal Courts Have the Jurisdiction and Power to Reduce An Existing Sentence

This Court has the power to adjust Flores' sentence. District courts no longer need a motion from the Bureau of Prisons to resentence a federal prisoner under the compassionate release provisions of 18 U.S.C. §3582(c)(1)(A)(i). A district court may now resentence if the inmate files a motion after exhausting administrative remedies. The reasons that can justify resentencing are not limited to medical, age, or family circumstances. A district court may resentence if the inmate demonstrates extraordinary and compelling reasons for a sentence reduction. Such reasons are present in this case.

### 1.    Historical Framework

Congress first enacted the compassionate release provisions in 18 U.S.C. §3582 as part of the Comprehensive Crime Control Act of 1984. That legislation provided

6

that a district court could modify a final term of imprisonment when extraordinary and compelling reasons warrant such a reduction. 18 U.S.C. §3582(c)(1)(A)(i). In 1984, this provision was conditioned on the Bureau of Prisons (BOP) filing a motion in the sentencing court. Absent a motion by the BOP, a sentencing court had no jurisdiction to modify an inmate's sentence. Congress did not define what constitutes an "extraordinary and compelling reason," but the legislative history recognized that the statute was intended, in part, to abolish and replace federal parole. Rather than have the parole board review for rehabilitation only, Congress authorized review for changed circumstances:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defender was convicted have been later amended to provide a shorter term on imprisonment. S. Rep. No. 98-225 at 55-56 (1983).

18 U.S.C. § 3582 acts as a "safety valve" for the "modification of sentences" that would previously have been addressed through the former parole system. *Id*. at 121. The provision was intended "to assure the availability of specific review and reduction of a term of imprisonment for "extraordinary and compelling reasons" and [would allow courts] to respond to changes in the guidelines." *Id*. Thus, sentencing courts have the power to modify sentences for extraordinary and compelling reasons.

7

2.    Section 3582(c)(1)(A) is Not Limited To Medical, Elderly
      or Childcare Circumstances

Congress initially delegated the responsibility for determining what constitutes

"extraordinary and compelling reasons" to the United States Sentencing Commission.

28 U.S.C. § 994(t) ("The Commission...shall describe what should be considered

"extraordinary and compelling reasons" for sentence reduction, including the criteria

to be applied and a list of specific examples." Congress provided one limitation to

that authority: "[r]ehabilitation of the defendant alone shall not be considered an

extraordinary and compelling reason." 28 U.S.C. § 994(t). Rehabilitation could,

however, be considered with other reasons to justify a reduction.

Pursuant to section 994(p) of title 28, United States Code, the United States

Sentencing Commission hereby submits to the Congress the following amendments

to the Guidelines Manual and the reasons therefor. As authorized by such section, the

Commission specifies an effective date of November 1, 2023, for these amendments:

(b)  *Extraordinary and Compelling Reasons.–* Extraordinary and
     compelling reasons exist under any of the following
     circumstances or a combination thereof:

     (1)  *Medical Circumstance of the Defendant.–*

          (A)  The defendant is suffering from a terminal illness
               (i.e., a serious and advanced illness with an
               end-of-life trajectory). A specific prognosis of life
               expectancy (i.e., a probability of death within a
               specific time period) is not required.

8

(B)   The defendant is—

    (i)   suffering from a serious physical or medical condition,

    (ii)   suffering from a serious functional or cognitive impairment, or

    (iii)   experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(C)   The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

(D)   The defendant presents the following circumstances—

    (i)   the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

    (ii)   due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and

    (iii)   such risk cannot be adequately mitigated in a timely manner.

9

(2) *Age of the Defendant.*— The defendant (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(3) *Family Circumstances of the Defendant.*—

   (A) The death or incapacitation of the caregiver of the defendant's minor child or the defendant's child who is 18 years of age or older and incapable of self-care because of a mental or physical disability or a medical condition.

   (B) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

   (C) The incapacitation of the defendant's parent when the defendant would be the only available caregiver for the parent.

   (D) The defendant establishes that circumstances similar to those listed in paragraphs (3)(A) through (3)(C) exist involving any other immediate family member or an individual whose relationship with the defendant is similar in kind to that of an immediate family member, when the defendant would be the only available caregiver for such family member or individual. For purposes of this provision, 'immediate family member' refers to any of the individuals listed in paragraphs (3)(A) through (3)(C) as well as a grandchild, grandparent, or sibling of the defendant.

10

(4) *Victim of Abuse.*— The defendant, while in custody serving the term of imprisonment sought to be reduced, was a victim of:

    (A) sexual abuse involving a 'sexual act,' as defined in 18 U.S.C. § 2246(2) (including the conduct described in 18 U.S.C. § 2246(2)(D) regardless of the age of the victim); or

    (B) physical abuse resulting in 'serious bodily injury,' as defined in the Commentary to §1B1.1 (Application Instructions); that was committed by, or at the direction of, a correctional officer, an employee or contractor of the Bureau of Prisons, or any other individual who had custody or control over the defendant. For purposes of this provision, the misconduct must be established by a conviction in a criminal case, a finding or admission of liability in a civil case, or a finding in an administrative proceeding, unless such proceedings are unduly delayed or the defendant is in imminent danger.

(5) *Other Reasons.*— The defendant presents any other circumstance or combination of circumstances that, when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are similar in gravity to those described in paragraphs (1) through (4).

(6) *Unusually Long Sentence.*— If a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the

11

motion is filed, and after full consideration of the
defendant's individualized circumstances.

This amendment responds to, among other things, the First Step Act of 2018

("First Step Act"), Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239, which

amended 18 U.S.C. § 3582(c)(1)(A) to authorize courts to grant a motion for a

sentence reduction upon a defendant's own motion. Previously, a court was

authorized to do so only upon the motion of the Director of the Bureau of Prisons

("BOP"). Congress amended the law for the express purpose, set forth on the face of

the enactment, of "increasing the use" of sentence reduction motions under section

3582(c)(1)(A). First Step Act § 603(b).

3.    The First Step Act

The First Step Act, P.L. 115-391, 132 Stat. 5194, at (Dec. 21, 2018), among

other things, transformed the process for compassionate release. *Id.* at § 603. Now,

instead of depending upon the BOP to determine an inmate's eligibility for

extraordinary and compelling reasons and the filing of a motion by the BOP, a court

can resentence "upon motion of the defendant." A defendant can file an appropriate

motion if the he or she has exhausted all administrative remedies or "the lapse of 30

days from the receipt of such a request by the warden of the defendant's facility,

whichever is earlier." 18 U.S.C. §3582(c)(1)(A). The purpose and effect of this

provision is to give federal courts the ability to hear and resentence a defendant even in the absence of a BOP motion. Congress labeled this change "Increasing the Use and Transparency of Compassionate Release." 164 Cong. Rec. H10346, H10358 (2018). Senator Cardin noted in the record that the bill "expands compassionate release under the Second Chance Act and expedites compassionate release applications." 164 Cong. R. 199 at S7774 (Dec. 18, 2018). In the House, Representative Nadler noted that the First Step Act includes "a number of very positive changes, such as ... improving application of compassionate release, and providing other measures to improve the welfare of federal inmates." 164 Cong. R. H10346-04 (Dec. 20, 2018).

Once an inmate has pursued administrative remedies through the BOP, upon his or her motion, the sentencing court has jurisdiction and the authority to reduce a sentence if it finds "extraordinary and compelling reasons" to warrant a reduction. Judicial authority is no longer limited to cases that have the approval of the BOP.

### 4. Flores Has Exhausted Administrative Remedies

A motion by an inmate can be filed in the district court after (1) the inmate has made the request to the Warden, and (2) either the request was denied or 30 days have lapsed from the receipt of the request, whichever is sooner. First Step Act of 2018, section 803(b), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018).

13

Flores has filed a request for compassionate release to the Warden at FCI Florence, but he has not received a response yet. Because 30 days have lapsed from the receipt of the request and the BOP failed to file a motion on Flores' behalf, exhaustion of administrative remedies is not an issue in this case. See 18 U.S.C. § 3582(c)(1)(A).

**B.** **The Changes in Relevant Law, along with Unwarranted Sentence Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct, Are Extraordinary and Compelling Circumstances That Warrant Release.**

Section 3582(c) states that a district court cannot modify a term of imprisonment once it has been imposed except that, in any case:

> The court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
> > (i) extraordinary and compelling reasons warrant such a reduction.

18 U.S.C. § 3582(c)(1)(A).

In this case, there are at least five extraordinary and compelling reasons warranting such a reduction, discussed as follows:

## 1. First Step Act— Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A)

This responds to the First Step Act of 2018, Pub. L. 115–391 (Dec. 21, 2018) ("First Step Act" or "Act"), which contains numerous provisions related to sentencing, prison programming, recidivism reduction efforts, and reentry procedures. Specifically, the sentencing reform provisions of the Act (1) amended the sentencing modification procedures set forth in 18 U.S.C. § 3582(c)(1)(A) to allow a defendant to file a motion seeking a reduction in the defendant's term of imprisonment under certain circumstances; (2) reduced certain enhanced penalties imposed pursuant to 21 U.S.C. § 851 for some repeat offenders and changed the prior offenses that qualify for such enhanced penalties; (3) broadened the eligibility criteria of the "safety valve" provision at 18 U.S.C. § 3553(f); (4) limited the "stacking" of certain mandatory minimum penalties imposed under 18 U.S.C. § 924(c) for multiple offenses that involve using, carrying, possessing, brandishing, or discharging a firearm in furtherance of a crime of violence or drug trafficking offense; and (5) allowed for retroactive application of the Fair Sentencing Act of 2010. Revisions to the Guidelines Manual may be appropriate to implement the Act's changes to 18 U.S.C. § 3582(c)(1)(A).

The 814 Amendment had also revised the list of "extraordinary and compelling reasons" in §1B1.13 in several ways.

15

The sixth amendment added a new category ("Unusually Long Sentences") providing that if a defendant received an unusually long sentence and has served at least 10 years of the term of imprisonment, a change in the law (other than an amendment to the Guidelines Manual that has not been made retroactive) may be considered in determining whether the defendant presents an extraordinary and compelling reason, but only where such change would produce a gross disparity between the sentence being served and the sentence likely to be imposed at the time the motion is filed, and after full consideration of the defendant's individualized circumstances. See USSG §1B1.13 (b)(6).

In this case, Flores had already served his sentence for 13 years and 7 months. Under the 814 Amendment, this is considered to be an unusually long and harsh sentence. Thus, this presents as an "extraordinary and compelling reasons." See *United States v. Salliey*, CRIMINAL ACTION RDB-10-0298 (D. Md. Feb. 13, 2023), the Court concludes that the length of Salliey's sentence, the substantial time he has already served, and his strong evidence of rehabilitation are collectively sufficient. Salliey was sentenced to a term of 204 months, or seventeen years, for possession of a firearm.  (See Judgment 2.) The record reflects that he has already served a substantial portion of that sentence, and that he is scheduled to be released in just over two years.

16

### 2. Methamphetamine Drug Purity Is Not a Proxy for Culpability

Methamphetamine, commonly known as "meth", is a highly addictive and potent stimulant drug that can have devastating effects on individuals and communities. It was made a Schedule II controlled substance in 1970. In light of the serious harm caused by methamphetamine, the criminal justice system has taken a strong stance against methamphetamine trafficking. When methamphetamine dealers are arrested they face stiff penalties designed to punish the offender and deter recidivism. In determining appropriate punishment, courts must consider a range of factors, including the weight of the controlled substance, a defendant's prior criminal history, adjustments such as the defendant's role in the drug organization, and other relevant circumstances. However, one factor – the purity of methamphetamine – has been given disproportionate emphasis in determining punishment when purity is not a proxy for culpability.

The United States Sentencing Guidelines use a two-tiered system to set the base offense level for prosecuting a methamphetamine distribution case. One tier establishes a base offense level for high-purity methamphetamine known as "actual methamphetamine" while the other tier sets the level for "mixtures" which are substances containing a detectable amount of methamphetamine. As you might

expect, defendants prosecuted for distribution of actual methamphetamine get longer sentences than defendants caught with a methamphetamine mixture. The intention of this sentencing disparity is to target the most serious offenders, but its effect is to punish all offenders with the most severe penalties without regard for an individual's actual role in the offense. This highlights the need for reform in drug sentencing laws and a more nuanced approach to addressing drug-related offenses.

Take for example a Defendant charged with Possession with Intent to Distribute 4.5 kilograms of actual methamphetamine versus a Defendant charged with distributing the same amount of a mixture of methamphetamine. Under the Statute, crimes involving pure methamphetamine trigger a ten-year mandatory minimum penalty at 50 grams, while crimes involving a methamphetamine mixture trigger a ten-year mandatory minimum penalty at 500 grams. This is commonly referred to as the 10:1 purity ratio from the mandatory minimum penalties contained in 21 U.S.C. § 841(b)(1). With no prior criminal history, the first Defendant with actual methamphetamine has a base offense level of 38 (235 – 293 months of imprisonment) while the second Defendant with a mixture has a base offense level of 32 (121 – 151 months of imprisonment). That is a 9 ½ year difference at the low end of the guideline range or a 94 percent increase in the sentence due solely to the purity of the methamphetamine.

18

The concept of drug purity plays a critical role in drug-related offenses. The reason behind increasing a defendant's sentence based on drug purity is rooted in the fact that controlled substances are often cut and diluted with other substances as they pass from wholesaler to regional distributors to street-level dealers. In devising the Guidelines, the Sentencing Commission took into account that a defendant in possession of a controlled substance of very high purity is an indication of the defendant's significant involvement in the criminal organization and proximity to the source of the drugs. "The point, then, of increasing a defendant's sentence based on drug purity is to punish defendants who have prominent roles in drug distribution." *United States v. Ibarra-Sandoval*, 265 F. Supp. 3d 1249, 1255 (D.N.M. 2017). However, the assumption made by the Sentencing Commission regarding the correlation between methamphetamine purity and a defendant's criminal role is not supported by real-world evidence. In fact, this assumption potentially leads to serious miscarriages of justice. As *Ibarra-Sandoval* remarked, "the Commission's assumption regarding the connection between methamphetamine purity and criminal role is divorced from reality." 265 F. Supp. 3d 1249 at 1255.

As the court in *Ibarra-Sandoval* discussed, "The average purity of methamphetamine today is over 90 percent. This means that the sentencing Guidelines would treat the average individual convicted of a crime involving

19

methamphetamine as a kingpin or leader, even though that simply is not true." Id. at 1255–56. In *United States v. Bean*, 371 F. Supp. 3d 46, 52–53 (D.N.H. 2019) the court stated, "In the current market, the purity of methamphetamine does not necessarily reflect a defendant's role in the distribution chain. Low-level street dealers are just as likely as so-called 'kingpins' to have access to, and be charged with distribution of, extremely pure methamphetamine. In effect, then, the purity-based methamphetamine guidelines are treating all defendants as kingpins, even though that is not necessarily true."

Trends have shown that the price per pure gram of methamphetamine has steadily decreased while the purity has increased. From 2011 to 2016, the average purity of one gram of methamphetamine has ranged from a low of 85.5 percent in early 2011 to almost 95 percent in early 2014, and for the third quarter of 2016, averaged 93.5 percent pure. See, *United States v. Nawanna*, 321 F.Supp.3d 943, 951 (N.D. Iowa 2018). "Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution." *United States v. Siddoway*, 2023 WL 2246705, at *3 (D.Idaho, 2023). Today, a low-level street dealer would be distributing methamphetamine that would be similar in purity to the methamphetamine that came from the top of the supply chain.

20

The *Nawanna* court found that "because today's methamphetamine is substantially pure, purity is not a proxy for relative culpability." 321 F.Supp.3d at 951. The *Nawanna* court noted "that there was once some truth to the Commission's assumption that large quantities are associated with high purities, because methamphetamine was cut as it worked its way down to the street-level dealer or user, but that is no longer the case." *Id*. The *Nawanna* court concluded that "because of the generally very high purity of methamphetamine available today at all levels of the distribution chain, virtually all defendants today face enhanced punishment for a factor present in virtually all methamphetamine cases, not enhanced punishment based on individualized determinations, making the Guidelines purity enhancement excessive." *Id*. at 954.

The current Guidelines for methamphetamine have proven to be ineffective in achieving its intended goal of targeting high-level drug distributors. Instead, they recommend harsher penalties for all individuals involved in the distribution of methamphetamine, regardless of their level of involvement. The Guideline's reliance on drug purity as a factor for determining an individual's role within the organization is outdated and irrelevant in today's drug landscape. As a result, the Guidelines recommend more severe punishments for all offenders based on the drug's purity without taking into account each participant's role in the offense.

The Federal Statute, 21 U.S.C. § 841(b)(1), should be amended to abolish arbitrary minimum sentences ascribed to actual methamphetamine. Minimum statutory sentences restrict a court's ability to fashion a sentence that takes into account a defendant's unique relevant circumstances and role in the offense. Furthermore, the United States Sentencing Guidelines should be updated to reflect that purity is no longer a proxy for culpability. The Guideline for methamphetamine mixtures should be applied regardless of the purity of the methamphetamine possessed.

   3.   Refusal to Follow the Actual (and Ice) Methamphetamine
        Guideline Based on Policy Disagreement

Two judges in the Northern District of Iowa recently have announced that they disagree with on policy grounds, and no longer will follow, the marijuana equivalency called for in the Sentencing Guidelines when imposing sentences in cases involving actual methamphetamine and ice.

The Sentencing Guidelines distinguish between a methamphetamine mixture and actual/pure methamphetamine or ice, which it defines as methamphetamine that is at least 80% pure, treating actual/pure methamphetamine or ice ten times more harshly than a mixture of marijuana. One gram of actual (pure) methamphetamine or ice has a marijuana equivalency of 20 kilograms whereas one gram of a

22

methamphetamine mixture has an equivalency of 2 kilograms. The ratio has its roots in 21 U.S.C. 841(b)(1). Comment 27(c) to U.S.S.G. § 2D1.1 offers the only explanation of the Commission's view on the relevance of purity to the appropriate sentence, asserting that purity "is probative of the defendant's role or position in the chain of distribution" and that "since controlled substances are often diluted and combined with other substances as they pass down the chain of distribution, the fact that a defendant is in possession of unusually pure narcotics may indicate a prominent role in the criminal enterprise and proximity to the source of the drugs."

As Chief Judge Leonard T. Strand and District Judge Mark W. Bennett explain in *United States v. Harry*, 313 F. Supp. 3d 969 (N.D. Iowa 2018) and *United States v. Nawanna*, 321 F. Supp. 3d 943 (N.D. Iowa 2018), respectively, there is no empirical basis for the 10-1 ratio and, because nearly all methamphetamine trafficked is substantially pure, purity is not an accurate proxy for culpability and it makes little sense to enhance virtually all methamphetamine defendants' sentences on the basis of purity. Both judges indicated that they therefore will apply the only the 2 kilogram marijuana equivalency even in cases involving actual/pure methamphetamine or ice.

As with the crack/powder cocaine disparity, District Courts have the discretion to disagree with the Guidelines on policy grounds and find that a particular Guideline should not applied in a given case. In this case involving actual/pure

methamphetamine or ice, it is essential to note that there is no empirical basis for applying the 10-1 ratio and that, because purity is not actually a proxy for culpability, the court should not apply it in this case. In *U.S. v. Robinson*, No. 3:21-CR-14-CWR-FKB-2 (S.D. Miss. Dec. 23, 2022), the Guidelines use drug purity as a proxy for culpability. But national experience suggests that is no longer true for methamphetamine. The DEA data show that most methamphetamine confiscated today is "pure" regardless of whether the defendant is a kingpin or a low-level addict. See *United States v. Hendricks*, 307 F. Supp. 3d 1104, 1108 (D. Idaho 2018) ("Today, most methamphetamine seized at all distribution levels is remarkably pure, which means that higher purity is not a good indicator of a defendant's place in the chain of distribution."); *Carrillo*, 440 F. Supp. 3d at 1154 ("Since the Guidelines first took effect, unusually pure methamphetamine has become increasingly more common.").

Given the on-the-ground reality in methamphetamine cases, the better way to determine culpability is to examine all of the circumstances of the defendant's case and life -- seeing the defendant as a "whole person," as the Supreme Court just instructed in *Concepcion*. 142 S. Ct. at 2395. There are sentencing enhancements available for leaders, organizers, or managers of criminal enterprises. If the defendant's case warrants, those enhancements should be applied. In the context of methamphetamine though, purity is no longer probative of the defendant's

culpability. In conclusion, Robinson's motion was granted by the District Court and Judge Reeves, ordered that his base offense level will be 26.

Thus, in light of *Robinson*, the Court should consider and resentence Flores based only on more than 500 grams of pure methamphetamine and not for at least 1.5 kilograms of methamphetamine-ICE.

### 4.    Drug Weight Calculation

Here, Flores urges the Court to assess *United States v. Stanback*, 377 F. Supp. 3d 618 (W.D. Va. 2019). In *Stanback*, Kelly George Stanback, represented by counsel, filed a motion to reduce his sentence pursuant to Section 404(b) of the First Step Act of 2018. ECF No. 1449. He asks the court to reduce his current sentence of 248 months to time served. The government asserts that Stanback is ineligible for consideration of a reduction in his sentence, and in the alternative, that if he is eligible for consideration, a further reduction of his sentence is not warranted. The government suggests that the only relief to which Stanback is entitled is a reduction in his term of supervised release from 5 years to 4 years. For the reasons set forth below, the court granted Stanback's request and modified his sentence to time served, to be followed by a 4-year term of supervised release.

The drug weight is an element of the offense and that any fact that increases a mandatory minimum penalty is an element that must be charged in an indictment and

25

proved to a jury beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and *Alleyne v. United States*, 570 U.S. 99, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). Under those two cases, if Stanback were sentenced today, his sentence would be based on distributing 5 grams or more of cocaine base, and not 3,000 kg to 10,000 kg of Marijuana equivalent.

In *Apprendi*, the Supreme Court held that the Sixth Amendment to the Constitution requires that any fact that increases the penalty for a crime beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be submitted to a jury and proved beyond a reasonable doubt. In *Alleyne*, the Court applied *Apprendi* to the federal mandatory minimum and maximum sentencing scheme and held that because mandatory minimum sentences increase the penalty for a crime, any fact that increases the mandatory minimum is an element of the crime that must be submitted to the jury. *Id.* at 116, 133 S.Ct. 2151 (overruling *Harris v. United States*, 536 U.S. 545 (2002)).

Neither *Apprendi* nor *Alleyne* are retroactively applicable on collateral review. See *United States v. Sanders*, 247 F.3d 139, 146 (4th Cir. 2001) (joining other circuits in finding that *Apprendi* does not apply retroactively to cases on collateral review); and *United States v. Stewart*, 540 Fed.Appx. 171 (4th Cir. 2013) (*per curiam*) (noting that *Alleyne* has not been made retroactively applicable to cases on collateral review).

However, for a period of time after *Apprendi* was decided, including before passage

of the Fair Sentencing Act in 2010, the jury ordinarily made a finding regarding the

threshold penalty, but the court could and did impose statutory-minimum penalties

regardless of any jury finding. That practice was authorized by *Harris*, and *Alleyne*

did not overrule *Harris* until three years later, and three years after the Fair

Sentencing Act was enacted. Nonetheless, Congress, when drafting the First Step Act

in 2018, surely did not intend for courts to disregard the last six years of Supreme

Court federal sentencing jurisprudence and this court declines to do so.

  *Alleyne* made clear that in order to preserve a defendant's Sixth Amendment

right to a jury trial, any fact that increases the statutory mandatory minimum sentence

is an element of the crime which must be submitted to the jury. *Alleyne*, 570 U.S. at

116, 133 S.Ct. 2151. In this case, Flores was pled guilty of possession with intent to

distribute 500 grams or more of methamphetamine. Under *Alleyne*, this court is not

free to ignore that finding and impose a penalty based on approximately 1.5

kilograms of ice-methamphetamine. Thus, although *Apprendi* and *Alleyne* are not

retroactively applicable on collateral review, this court joins other courts in finding

that their holdings are applicable in the context of the First Step Act. See *United

States v. Simons*, No. 07-CR-00874, 375 F.Supp.3d 379, 487, 2019 WL 1760840 at

*6 (E.D.N.Y. Apr. 22, 2019) (citing *Alleyne* and finding that statutory penalties are

27

determined by facts submitted to a grand jury, trial jury, or established by a guilty plea while findings by a judge may be used to determine a sentence within the statutory penalties and cannot change "the mandatory minimum sentence now applicable"); *United States v. Dodd*, No. 3:03-CR-18-3, 372 F.Supp.3d 795, 2019 WL 1529516 (S.D. Iowa, Apr. 9, 2019) (finding in a First Step Act case that "[b]oth *Apprendi* and *Alleyne* are binding on this Court for sentencings held today."); *United States v. Davis*, No. 07-CR-245(S)(1), 2019 WL 1054554 (W.D.N.Y. Mar. 6, 2019), appeal docketed, No. 19-874 (2nd Cir. Apr. 5, 2019) ("[I]t is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act."); see also *United States v. Laguerre*, No. 5:02-CR-30098-3, 2019 WL 861417 (W.D. Va. Feb. 22, 2019) (relying without discussion on charged drug weight rather than PSR weight to find defendant eligible for relief).

Hence, Flores claims that the government would have had to allege 500 grams or more of methamphetamine even though he was held accountable for approximately 1.5 kilograms of ice-methamphetamine.

> 5.   Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty of Similar Conduct

We know that different judges sentence criminal defendants convicted of the same crimes to different sentences. Maybe there are good reasons for that, and maybe

there are reasons we should value individualized sentencing. But it turns out that there are "significant disparities" in the way federal judges sentence defendants in financial fraud cases, at least according to Assistant Attorney General Lanny A. Breuer. Does that make sense? Should something be done?

Speaking at the American Lawyer/National Law Journal Summit in Washington, D.C., Breuer stated that "[w]ith increasing frequency, federal judges have been sentencing fraud offenders – especially offenders involved in high-loss fraud cases – inconsistently." He added that "a defendant in one district may be sentenced to one or two years in prison for causing hundreds of millions of dollars in losses, while a defendant in another district is sentenced to 10 or 20 years in prison for causing much smaller losses."

Breuer said that the data "show that the district in which a person is sentenced can have a huge impact on how much time he or she spends in prison" and that "many prosecutors, defense lawyers, and judges agree that more and more, the length of a defendant's sentence depends primarily on the identity of the judge assigned to the case, and the district in which he or she is in."

With respect to the need to avoid unwarranted sentencing disparities, Flores urges the Court to consider the following *Redd* cases:

i.     *United States v. Clark, Case No. 11-CR-30-2-JPS (E.D. Wis. Jul. 23, 2020)*

• Quoting that in *Redd*, the Court evaluated whether extraordinary and compelling reasons existed to reduce the sentence by considering (1) the sentence the defendant originally received compared to the one he would receive today; (2) the disparity between those sentences; and (3) the reason for that disparity. *Redd*, 2020 WL 1248493, at *5. There, the court determined that the disparity was "primarily the result of Congress' conclusion that sentences like [defendant's] are unfair and unnecessary." *Id.* at *6.

ii.    *United States v. Brooks, Case No. 07-cr-20047-JES-DGB (C.D. Ill. May. 15, 2020)*

• Quoting that in *Redd*, the district court held "a court may find, independent of any motion, determination or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in USSG § 1B1.13 cmt. n.1(A)-(C) and that the reasons it has determined in this case constitute extraordinary and compelling reasons warranting a sentence reduction satisfy any requirement for consistency with any applicable policy statement."

If Flores was re-sentenced today, in light of the First Step Act; and the need to avoid unwarranted sentencing disparities, his sentence would be significantly less harsh.

The unwarranted sentencing disparity factor must be determined only with reference to those comparably situated defendant who was sentenced after Flores'

30

sentencing and those being sentenced today under a different sentencing structure. Flores' sentence in June 2010 is now disparate relative to Defendants who were sentenced after December 21, 2018.

See e.g., *United States v. Vazquez-Rivera*, 470 F.3d 443, 449 (1ˢᵗ Cir. 2006) (recognizing that "a district court may consider disparities among co-defendants in determining a sentence"); *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006) ("Although § 3553(a) does not require district courts to consider sentencing disparity among co-defendants, it also does not prohibit them from doing so."); *United States v. Gomez*, 215 F. App'x 200, 202 (4ᵗʰ Cir. 2007) (implying that consideration of co-defendant disparities is allowed, but concluding that Gomez was not similarly situated to the co-defendant); *United States v. Bennett*, 664 F.3d 997, 1015 (5ᵗʰ Cir. 2011) ("[A]voiding unwarranted sentencing disparities among co-defendants is a valid sentencing consideration."), cert. denied, 11-9109, 2012 WL 733887 (Apr. 2, 2012); *United States v. Simmons*, 501 F.3d 620, 624 (6ᵗʰ Cir. 2007) ("A district judge, however, may exercise his or her discretion and determine a defendant's sentence in light of a co-defendant's sentence."); *United States v. Pulley*, 601 F.3d 660, 668 (7ᵗʰ Cir. 2010) ("Pulley properly contends that § 3553(a)(6) does not allow unwarranted sentencing disparities between co-defendants." (citing *Statham*, 581 F.3d at 556; *Bartlett*, 567 F.3d at 908–09)); *United States v. Lazenby*, 439 F.3d 928, 933 (8ᵗʰ Cir.

31

2006) (invalidating a sentence that resulted in unwarranted disparities between the sentences of the defendant and less culpable members of related conspiracies); *United States v. Saeteurn*, 504 F.3d 1175, 1181–83 (9th Cir. 2007) (upholding as a legitimate generalized § 3553(a) consideration the district court's decision to compare defendant with his co-defendants and sentence him in accordance with his role); *United States v. Smart*, 518 F.3d 800, 804 (10th Cir. 2008) ("[A] district court may also properly account for unwarranted disparities between codefendants who are similarly situated, and...the district court may compare defendants when deciding a sentence."); *United States v. Zavala*, 300 F. App'x 792, 795 (11th Cir. 2008) ("It is not erroneous for the district court to have considered the 'unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct' when the statute specifically mandates such consideration."); *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (considering and rejecting an argument that a disparity between co-defendants' sentences was unwarranted), cert. denied, 131 S. Ct. 586 (2010).

Under 18 U.S.C. § 3582(c)(2), to modify Flores' sentence, taking into account the advisory nature of the guidelines after *Booker* and the considerations set forth in 18 U.S.C. § 3553(a). The court should find that a sentence of time served is sufficient, but not greater than necessary, and accounts for the sentencing factors the court must

consider pursuant to 18 U.S.C. § 3553(a), specifically deterrence, protection of the public, and respect for the law.

It is essential to also note that since Flores' incarceration began, he has taken numerous steps to attempt to improve himself in "post-conviction rehabilitation." This effort and its obvious achievements should be welcome news to this Honorable Court due to the fact that Flores has taken continuous strides to prepare himself for reentry back into society to be a law abiding citizen. This is a factor which the Court should take into consideration.

## IV. <u>CONCLUSION</u>

For the above and foregoing reasons, Flores' prays that this Court grants his Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A), the First Step Act of 2018, and USSG Amendment 814, and resentence him to time served or any other relief that the Court deems appropriate.

Respectfully submitted,

Dated: ~~January~~ MAY 6 , 2024

SERGIO OMAR FLORES
REG. NO. 41063-177
FCI FLORENCE
FEDERAL CORR. INSTITUTION
PO BOX 6000
FLORENCE, CO 81226

33

## CERTIFICATE OF SERVICE

I hereby certify that on ~~January~~ MAY 6, 2024, I mailed a true and correct copy of the above and foregoing Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018, sent via U.S. Mail, postage prepaid, to Denise Bridges Williams-DOJ, U.S. Attorney's Office, 1205 Texas Ave., 7th Floor, Lubbock, TX 79401.

SERGIO OMAR FLORES

34

SERGIO OMAR FLORES
REG. NO. 41063-177
FCI FLORENCE
FEDERAL CORR. INSTITUTION
PO BOX 6000
FLORENCE, CO 81226



~~January~~ 6, 2024
MAY

Ms. Karen Mitchell
Clerk of Court
U.S. District Court
Northern District of Texas
Amarillo Division
205 SE 5th Avenue, Room 133
Amarillo, TX 79101-1559

MS. DENISE BRIDGES WILLIAMS-DOJ
US ATTORNEY'S OFFICE
1205 TEXAS AVE, 7TH FLOOR
LUBBOCK, TX 79401

RE:   *Flores v. United States*
Crim No. 2:10-cr-00039-J-BB-1

Dear Ms. Mitchell:

Enclosed please find and accept for filing Movant's Motion for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) and the First Step Act of 2018. Please submit this document to the Court.

Thank you for your assistance in this matter.

Sincerely,

SERGIO OMAR FLORES
Appearing *Pro Se*

*Encl. as noted*



SERGIO OMAR FLORES #41063-177
FEDERAL CORRECTIONAL COMPLEX
FCI BEAUMONT
PO BOX 26040
BEAUMONT, TX 77720

RECEIVED
MAY 1 0 2024
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

Ms. DENISE BRIDGES - DOJ
WILLIAMS
U.S. ATTORNEY'S OFFICE
1205 TEXAS AVE, 7TH FLOOR
LUBBOCK, TX, 79401